TODD AND COMPANY, INC. and Thomas K. Langbein, Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 76–1690.

United States Court of Appeals, Third Circuit.

Argued March 29, 1977.

Decided June 27, 1977.

Lawrence E. Jaffe, Marcus, Rosen, Breslow, Levy, Jaffe & Fiorello, Totowa, N. J., for petitioners.

David Ferber, Sol. to the Commission, Alan Rosenblat, Asst. Gen. Counsel, Linda W. Jarett, Atty., S. E. C., Washington, D. C., for respondent.

Before ADAMS, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

A statutory plan for self-regulation by a securities dealers association provides for sanctions and procedural safeguards, including an appeal to the Securities and Exchange Commission. We find no constitutional obstacles to this largely non-judicial plan for settlement of disputes. However, we must vacate an order of the S.E.C. that failed to insist upon strict compliance by the association with its own procedural precepts.

In January, 1973, the District Business Conduct Committee for District No. 12 of the National Association of Securities Dealers, Inc., (N.A.S.D.), filed a complaint against petitioners Todd and Company, its president, Langbein, and a number of its salesmen, charging violations of the N.A. S.D. Rules of Fair Practice. The complaint stated two causes: first, on April 19, and 20, 1972, petitioners allegedly sold Automated Medical Laboratories, Inc. stock to the public without disclosing that Todd and Company both dominated and controlled the market and arbitrarily set the prices for that stock; and second, Todd and Company allegedly executed the transactions "at prices, and realized profits, which were unreasonable and unfair." Todd and Company, a registered broker-dealer, was a member of the N.A.S.D. and subject to its rules.

Petitioners' difficulties began in March, 1972, when Todd underwrote a public offering of 250,000 shares of Automated Medical Laboratories stock at $2.00 per share on an "all or none, best efforts" basis.[1] Allegedly in an effort to secure a wide distribution, Todd limited subscriptions to 500 shares per customer. However, in many instances prospective purchasers were permitted to purchase only a portion of the amount sought, often as little as 25 or 50 percent, despite the fact that the original request was for less than 500 shares. The offering was completed on April 17, 1972. On the following day, Todd began trading the stock on the basis of $4.00 bid, $5.00 asked, double the offering price for this obscure stock. During the next two days, April 19 and 20, Todd solicited customers to either buy or sell, and more than 100,000 shares changed hands, resulting in a gross profit to petitioners of $112,542.25.

After a hearing, the District Business Conduct Committee found that petitioners sold at unfair prices as alleged in the second cause of the complaint. The Committee commented on the 100 percent increase in the stock's price from its initial offering to the value set on April 19, and 20:

> "[A] premium is only a measure of an underlying demand for shares in excess of the supply. Where supply is sufficient to meet the demand, the co-existence of a premium can only result from an arbitrary price in a controlled market.
>
> \*    \*    \*    \*    \*    \*
>
> "In our view the violation charged in the second cause of complaint rests on whether Todd took advantage of its ability to set the price at the expense of its customers. We find that they did."

The Committee found petitioners' conduct "to be inconsistent with just and equitable principles of trade and to constitute separate and distinct violations of Sections 1, 4 and 18 of the Rules of Fair Practice." However, the first cause was dismissed, the Committee deciding disclosure of Todd's market domination was unnecessary. The Committee then: (1) suspended Todd's membership in the N.A.S.D. for one year; (2) barred Langbein from associating with a N.A.S.D. member for one year and limited the capacity in which he could be employed by other members for two years; (3) assessed a $50,000 fine; and (4) fined Todd's salesmen and suspended them for 30 days.

Petitioners appealed to the N.A.S.D. Board of Governors which took testimony and heard argument. In the course of affirming the Committee's decision on the second cause, the Board also determined

---

1. Either all the shares were to be sold or none of them. If all the shares were not sold, the purchase money would be returned to the subscribers.

that the first charge had been proven and reinstated it. However, the Board gave no notice of its intention to consider reinstating the first cause in advance of the hearing. Despite the presence of the additional violation, the Board reduced the sanctions by easing the restrictions on Langbein's employment during the two-year period and dismissing the complaint as to the salesmen. The Securities and Exchange Commission affirmed the N.A.S.D.'s decision but further reduced the suspensions from 1 year to 6 months.

Petitioners contend that the N.A.S.D. standards are unconstitutionally vague; that the Securities Exchange Act of 1934, 15 U.S.C. § 78o–3, authorizing the registration of the N.A.S.D., is an unconstitutional delegation of legislative authority; and that the Commission erred in affirming the Board of Governors' action in reinstating the first cause. We agree only with the last assertion.[2]

■ In 1938, Congress adopted the Maloney Act, 15 U.S.C. § 78o–3, to provide for self-regulation of the over-the-counter securities market. The statute permits the Securities and Exchange Commission to register an organization which has adopted rules

"designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade . . . and, in general, to protect the investors and the public interest . . . ." 15 U.S.C. § 78o–3(b)(6).[3]

Under the statute, disciplinary rules must require specific charges, a hearing of record, and a statement of the findings. 15 U.S.C. § 78o–3(h).[4] If the Association disciplines a member, a right of appeal to the Securities and Exchange Commission is provided. After affording the opportunity for a hearing, the Commission determines whether the petitioner committed the charged acts and whether they are in violation of the Association's rules. The S.E.C. may then reduce, cancel, or leave undisturbed the penalty imposed. 15 U.S.C. § 78s(e).[5] The Commission is not restricted to the record before the Association but may conduct a hearing of its own and consider such evidence as it deems relevant.

■ Petitioners first attack the Maloney Act as an unconstitutional delegation of legislative power to a private institution. In *R. H. Johnson & Co. v. Securities & Exchange Com'n.*, 198 F.2d 690 (2d Cir.), *cert. denied*, 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952), the Court of Appeals for the Second Circuit dismissed an identical challenge to the Act. Because the Commission (1) has the power, according to reasonably fixed statutory standards, to approve or disapprove the Association's rules; (2) must make *de novo* findings aided by additional evidence if necessary, and (3) must make an independent decision on the violation and penalty, the court found no merit in the unconstitutional delegation argument. We agree.[6] The Association's rules

---

**2.** Petitioners raise several additional issues which do not require discussion.

**3.** The statute was amended in 1975, and the quoted portion was formerly codified at 15 U.S.C. § 78o–3(b)(8). The amendments did not take effect until after the case had been submitted to the S.E.C. There are no changes in the substantive law applicable to this case and the U.S.C. citations to those portions of the statute are the current ones. Changes in the appropriate procedural aspects are noted *infra*.

**4.** Formerly 15 U.S.C. § 78o–3(b)(10).

**5.** The review provisions were formerly covered by 15 U.S.C. § 78o–3(h).

**6.** The appeal to the S.E.C. was briefed in early 1975 and argued before the Commission on

July 15, 1975. The 1975 amendments did not become effective until December 1, 1975. There are some changes in the amendments as they apply to hearings before the Commission, *e. g.*, under the 1934 Act, the S.E.C. is to make its decision "upon consideration of the record before the association and such other evidence as it may deem relevant . . . ." The 1975 amendment, on the other hand, states ". . . which hearing may consist solely of consideration of the record before the self-regulatory organization and opportunity for the presentation of supporting *reasons* to affirm, modify, or set aside the sanction . . . ." Our consideration of this case is confined to the 1934 Act, and we do not intimate any view on the constitutionality of the 1975 amendment.

and its disciplinary actions were subject to full review by the S.E.C., a wholly public body, which must base its decision on its own findings. *Nassau Securities Service v. Securities and Exchange Com'n.*, 348 F.2d 133 (2d Cir. 1965).

■ Petitioners also contend that the N.A.S.D. rules are so vague as not to inform members of the forbidden conduct and practices. It may be that the rules are couched in broad, general language.[7] However, " '[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.' *United States v. Mazurie*, 419 U.S. 544, 550 [95 S.Ct. 710, 42 L.Ed.2d 706] (1975)." *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975). Moreover, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974). In the case *sub judice*, petitioners' patent violation of the N.A.S.D. rules overcomes the vagueness challenge.

Even if petitioners' conduct had been somewhat more marginal, we could not sustain their argument. "All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden." *Rose v. Locke*, 423 U.S. 48, 50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975). The

language of Section 18 of the Rules of Fair Practice is not substantially different from that contained in § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), or the Commission's own free-wheeling Rule 10b–5, 17 C.F.R. § 240.10b–5, neither of which are unconstitutionally vague. *United States v. Persky*, 520 F.2d 283 (2d Cir. 1975). In our view, the N.A.S.D. Rules, addressed to a specialized industry, fairly put those governed on notice, and we think the conduct under review would reasonably have been expected by members to violate the Rules.[8] Accordingly, we reject petitioners' vagueness challenge.

■ We have reviewed the S.E.C.'s opinion and conclude that substantial evidence supports its decision finding a violation of the second count. Our function is not to independently weigh the facts as petitioners would have us do. Rather, after reviewing the record considered as a whole, including the evidence opposed to the S.E.C. view, we are to determine whether substantial evidence supports the Commission's decision. *Buchman v. S.E.C.*, 553 F.2d 816 (2d Cir. 1977); *R. H. Johnson & Co. v. S.E.C., supra.* The Commission was within its competence in deciding that the petitioners manipulated the market to sell at unreasonable prices. The Commission found that petitioners deliberately created the impression of a "hot issue" by artificially limiting the number of shares sold to each customer; intensively stimulating the market by contacting almost all purchasers; and carefully

---

7. The applicable rules provide:

"Sec. 1. A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade.

"Sec. 4. In 'over-the-counter' transactions, whether in 'listed' or 'unlisted' securities, if a member buys for his own account from his customer, or sells for his own account to his customer, he shall buy or sell at a price which is fair, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense involved, and the fact that he is entitled to a profit; and if he acts as agent for his customer in any such transaction, he shall not charge his customer more than a fair commission or service charge, taking into consid-

eration all relevant circumstances including market conditions with respect to such security at the time of the transaction, the expense of executing the order and the value of any service he may have rendered by reason of his experience in and knowledge of such security and the market therefore.

"Sec. 18. No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."

8. We need not decide whether Section 1 of the Rules of Fair Practice standing alone would withstand a vagueness challenge. *See Klein v. Securities and Exchange Commission*, 224 F.2d 861 (2d Cir. 1955). Here, it has been found that two other rules were also violated.

balancing purchases against sales. On this record, we cannot say that such findings were not supported by substantial evidence.

■ However, we are concerned with the clear disregard of the N.A.S.D. appellate procedures. The N.A.S.D.'s Code provides that an aggrieved member may appeal the disciplinary action taken by a District Business Conduct Committee within 15 days of the decision while the Board of Governors may, on its own motion, also request review within 45 days. Sec. 15(a).[9] The Board has the right to review a decision dismissing a complaint and, "after appropriate notice and opportunity for hearing," may reinstate the complaint and impose sanctions. Sec. 17.[10]

In the case at bar, only the aggrieved member appealed the Committee's decision—the Board did not. Therefore, the Committee's decision on the second cause was the only matter preserved for review before the Board of Governors. Since the Board neither appealed the first cause's dismissal nor gave notice to petitioners that the dismissal was to be reconsidered, the Board's scope of review was limited by petitioners' appeal. The statute and rules are clear: a party being sanctioned or disciplined must have notice of the charges. If the Committee dismisses a charge, it cannot be reinstated by the Board of Governors without notice and the opportunity to be heard on that specific charge. To do otherwise would overlook the clear requirement of the statute requiring notice and hearing.

The S.E.C. admits that "[t]he Board reversed the District Committee's dismissal of the first charge without notice to respondents," but argues that "the Association's error, if any, was patently harmless," since both charges "turn on the same facts." We disagree. The Board of Governors' action violated the N.A.S.D. rules and deprived petitioners of the procedural benefit due them. If the Board had observed the rules, it would have imposed punishment for but one violation. In this non-judicial setting, foreclosing the possibility of receiving a lessor penalty than that ultimately assessed is not an illusory injury.

Charged with making independent decisions and its own interpretations of the N.A.S.D.'s rules, the Commission must insure fair treatment of those disciplined by the Association. The independent review function entrusted to the S.E.C. is a significant factor in meeting serious constitutional challenges to this self-regulatory mechanism. Since it is a departure from the traditional governmental exercise of enforcement power in the first instance, confidence in the impartiality and fairness of the Association's procedures must be maintained. The S.E.C., therefore, should not cavalierly dismiss procedural errors affecting the rights of those subjected to sanctions but should insist upon meticulous compliance by the private organization.

Neither the Commission nor the Board of Governors specified a separate penalty for each charge. Consequently, we do not know whether a lesser penalty would have been imposed by either body if only one count were left standing. The Commission should have remanded the case to the Board

9. "Sec. 15(a). If a District Business Conduct Committee shall take any disciplinary action against any member, or shall dismiss any complaint, as hereinabove provided, such action or dismissal shall be subject to review by the Board of Governors on its own motion within forty-five (45) days after the date of the notice required by Section 11 hereof. Any such action or dismissal shall also be subject to review upon application by any person aggrieved thereby, filed within fifteen (15) days after the date of the notice required by Section 11 hereof."

10. "Sec. 17. In any proceeding to review the *action of a District Business Conduct Commit-*

*tee in dismissing any complaint against a member, if the Board of Governors after appropriate notice and opportunity for hearing,* upon consideration of the record before the District Business Conduct Committee and of such other evidence as it may deem relevant, shall determine that the member should have been disciplined, it may set aside the action taken by the District Business Conduct Committee and may impose any penalty upon the member provided for in Section 1 of Article V of the Rules of Fair Practice, which the Board of Governors may, in its discretion, deem to be just . . . ." (Emphasis supplied)

of Governors with instructions to dismiss the first cause and to reconsider the sanction. Thereafter, if the petitioners were still dissatisfied, the Commission could have again reviewed the imposed sanctions. So that petitioners' rights may be protected, we direct that this procedure be followed. Accordingly, the order of the S.E.C. will be vacated and the case will be remanded with instructions to proceed in accordance with this opinion.