# Constitutional Issues Raised by Inter-American Convention on International Commercial Arbitration

Proposed legislation giving Inter-American Commercial Arbitration Commission (IACAC) power to amend rules which have been enacted by Congress would result in an improper delegation of legislative power to a private organization, and any amended rule could not constitutionally be applied to agreements entered into after the effective date of the amendments.

Provision in proposed legislation allowing one House of Congress to disapprove amendments to IACAC rules, although not a veto of executive action, nonetheless violates the Presentment Clauses.

An alternative review mechanism whereby the Secretary of State would be required to approve or disapprove amendments to the IACAC rules would be constitutionally acceptable, since the amendments would not be binding on the government but merely advisory.

March 20, 1980

## MEMORANDUM OPINION FOR THE ASSISTANT LEGAL ADVISER FOR PRIVATE INTERNATIONAL LAW, DEPARTMENT OF STATE

This responds to your request for the views of the Justice Department on the congressional review mechanism in the proposed implementing legislation for the Inter-American Convention on International Commercial Arbitration. You ask whether the review mechanism constitutes a "legislative veto." Our analysis of the review mechanism in the proposed legislation raises an additional question whether Congress may delegate its legislative power to the Inter-American Commercial Arbitration Commission (IACAC), a private organization. While the law is not clear in this area, we conclude that the delegation made in the proposed legislation presents serious constitutional problems. We believe, however, that the constitutional problems could be ameliorated if IACAC's amendments to its rules were applicable only to agreements entered into after the effective date of the amendments. The review mechanism in the proposed legislation, although not a veto of executive action, is a legislative veto and is, therefore, unconstitutional. At your request, we suggest an alternative review mechanism.

# I.

The Inter-American Convention on International Commercial Arbitration provides that, when parties of signatory nations have agreed to submit to arbitration any dispute that may arise out of a commercial transaction, the arbitration shall be conducted in accordance with the rules of procedure of the IACAC unless the parties have expressly agreed otherwise. Articles 1 & 3. The proposed implementing legislation for the Convention defines the rules referred to in Article 3 of the Convention to be those rules as promulgated by the Commission on January 1, 1978. § 306(a). If the IACAC modifies or amends its rules, § 306(b) would require the Secretary of State to transmit to the House of Representatives and the Senate a document containing the rules as modified or amended together with a report setting forth the reasons for and the effect of such modifications or amendments. A majority of either the House or Senate may disapprove the rules as modified or amended within 90 days of the transmission. If the rules are not disapproved, the rules shall be published after 90 days have elapsed and shall become effective 120 days after publication. If the rules are disapproved, the Secretary is required to use his best efforts to reconvene the rulemaking body of IACAC to ensure that the rules applicable to the signatory parties to the Convention are uniform.

# II.

The threshold question presented by the proposed implementing legislation is whether it involves an unconstitutional delegation of legislative power to a private organization. The legislation would incorporate by reference and thereby enact the rules of procedure of the IACAC in effect as of January 1, 1978. Since it is assumed that Congress would review and approve the rules in enacting the legislation, the incorporation of those rules by reference does not involve a delegation of legislative power to a private organization. *Cf. United States* v. *Sharpnack,* 355 U.S. 286, 293 (1958). *See also* Liebmann, G.W., *Delegation to Private Parties in American Constitutional Law,* 50 Ind. L.J. 650, 680 (1975). However, the proposed legislation implicitly gives the IACAC the power to amend those rules subject to one House's disapproval of such amendments. In effect, the legislature would delegate to a private organization the power to amend congressional legislation. We believe that such a delegation raises serious constitutional problems.

In analyzing the delegation question, we are hampered by the fact that "[t]he case law has not crystallized any consistent principles, either in the federal courts or in the state courts." Davis, Administrative Law Treatise § 2.14 at 138 (1958). Nevertheless, a survey of the relevant Supreme Court cases provides some guidance. In 1908, the Supreme Court rejected a claim that a statute permitting the American Railway

Association to set the uniform height for drawbars on freight cars constituted an invalid delegation, *St. Louis, Iron Mountain & Southern Railway Co.* v. *Taylor,* 210 U.S. 281 (1908). Three years earlier, it had upheld a delegation to miners to make regulations governing the recording of mining claims and the amount of work necessary to establish possession of a mining claim. *Butte City Water Co.* v. *Baker,* 196 U.S. 119 (1905).

However, more recently the Court found invalid a delegation to producers of two-thirds of coal to fix for producers selling coal to government contractors the minimum wages and maximum hours of their workers. *Carter* v. *Carter Coal Co.,* 298 U.S. 238, 310 (1936). Holding that the delegation violated the Due Process Clause of the Fifth Amendment, the Court stated:

> The power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business.

*Id.* at 311. In *A.L.A. Schechter Poultry Corp.* v. *United States,* 295 U.S. 495 (1935), the Court, addressing the argument that a delegation to the President to approve codes of fair competition proposed by trade associations was proper because a delegation to the trade associations alone would be constitutional, stated:

> But would it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries? Could trade or industrial associations or groups be constituted legislative bodies for that purpose because such associations or groups are familiar with the problems of their enterprises? . . . Such a delegation of legislative power is unknown to our law and is utterly inconsistent with the constitutional prerogatives and duties of Congress.

*Id.* at 537. The Court in *Schechter* distinguished *St. Louis, Iron Mountain & Southern Railway Co.,* as involving a matter of a technical nature and *Butte City Water Co.* as a recognition of local customs and of the rules of miners concerning mining claims. 295 U.S. at 537.

Adopting this distinction, it could be argued that the IACAC rules are not substantive regulations capable of imposing anti-competitive or unfair restrictions but are merely "technical" rules promulgated by a

presumably disinterested body with a recognized expertise in arbitration procedure. *Cf.* Liebmann, *supra* at 680–719.

However, because the rules may affect substantive rights,[1] we are reluctant to conclude on the basis of this distinction that the delegation to the IACAC is clearly constitutional, especially in light of the scarcity and age of federal case law approving delegation to private bodies.[2]

Our concern about the effect such amendments might have on substantive rights would be significantly reduced if the amendments would apply only to agreements entered into after the effective date of the amendments. This approach would eliminate any potential for unfairness because a party entering an arbitration agreement would have the opportunity to examine the amendments to the IACAC rules and, if he regarded the amendments as unfair, could either decline to agree to arbitration or negotiate with the other party to the agreement the application of other rules or modifications to the amendments.[3] Whether you decide to apply the amended rules to all agreements in the interest of uniformity or only to agreements entered into after the effective ·date of amendments will determine whether governmental review is required. If the former approach is adopted, we believe that, in order to minimize the possibility of a challenge to amended IACAC rules, the rules should be subject to governmental review and adoption by legislation.

## III.

The proposed legislative veto mechanism, although it does provide some governmental review of IACAC amendments, presents other constitutional problems. As you point out in your memorandum, this review mechanism is unlike the classic "legislative veto" provision

---

[1] For instance, the rules govern the place of arbitration, the choice of law, the appointment of arbitrators, and the right to an oral hearing. It is conceivable that the rules could be amended in such a manner that American citizens could be disadvantaged in arbitration proceedings, *e.g.*, a country distant from the United States could be designated as the place of arbitration.

[2] Other problems could also be present here. First, a problem could arise out of the concept that, in a representative government, governmental powers should be vested in elected or disinterested *public* officials. In this manner, governmental decisions and processes are subject to the checks of a variety of legal controls such as the oath of office, the conflict of interest laws, the control over appropriations, the powers of appointment, confirmation, or removal, and ultimately the electoral process. Another problem arises from the nature of the power vested in the private body. It could be argued that rule-making power may be constitutionally vested only in "Officers of the United States" appointed pursuant to the Appointments Clause, Article II, § 2, clause 2. *See Buckley* v. *Valeo,* 424 U.S. 1, 113–41 (1976). Finally, if it is constitutional to delegate legislative power to private organizations, such a delegation should be subject to standards restricting the exercise of that power. *Cf. A.L.A. Schechter Poultry Corp.* v. *United States,* 295 U.S. 495 (1935). Although the courts' attitude toward delegation of legislative power to executive agencies without specific standards has relaxed considerably, *see generally* K.C. Davis, Administrative Law Treatise, §§ 2.05, 2.06 and 2.15 (1958), the lack of the checks mentioned above on a private organization's exercise of that power would suggest that standards imposed upon the exercise of legislative power by private organizations should be more stringent than the standards imposed on public bodies.

[3] Article 3 of the Inter-American Convention on International Commercial Arbitration applies the IACAC rules only when parties to an arbitration agreement have not expressly agreed otherwise.

which purports to vest one House of Congress with the power to veto Executive action. Instead, the provision would allow one House of Congress to veto "private" action. Assuming, *arguendo,* that Congress could delegate to the IACAC the power to amend rules that had been enacted by Congress, the question is whether the Constitution authorizes a procedure whereby one House may control the exercise of discretion vested in the IACAC.

Article I, § 1 of the Constitution vests all legislative powers in a Congress, consisting of a Senate and House of Representatives. Furthermore, those powers cannot be exercised absent participation by the President. Article I, § 7, clause 2 requires "[e]very Bill . . . be presented to the President of the United States" for his approval or disapproval before it can become a law. Article I, § 7, clause 3 provides that "[e]very Order, Resolution, or Vote" to which concurrence of both Houses is necessary shall be presented to the President for his approval or veto.[4]

The Presentment Clauses thus provide two primary checks on the exercise of legislative power—the principle of bicameralism and the Executive veto. The veto provision in the proposed implementing legislation would not respect these constitutional checks. The proposed legislation would allow one House of Congress to disapprove amendments to the IACAC rules, but that legislative decision would not be presented to the President for his approval or veto. Nor would the President be given the opportunity to veto any "approval" of the amendments because the approval would be expressed by congressional inaction. Further, exercise by one House of the veto power would purport to place on the Secretary of State a legal duty to take steps to reconvene the rulemaking body of the IACAC. In our view, legal duties may not be imposed on the Executive by the exercise of something less than the full legislative process. Finally, if Congress could constitutionally delegate to the IACAC its legislative power to amend the rules, that power may be revoked only by affirmative legislative action by both Houses of Congress and the President, not by one House of Congress disapproving the exercise of that power.

## IV.

If you decide that the IACAC rules amended should, as a matter of policy, apply to all arbitration agreements, you may wish to consider an

---

[4] Giving the President this integral role in the legislative process was believed necessary by the Framers in order to limit congressional power. As James Madison put it: "[I]t is against the enterprising ambition of this [legislative] department that the people ought to indulge all their jealousy and exhaust all their precautions." The Federalist No. 48, at 309 (New American Library Ed. 1961). Alexander Hamilton viewed the veto power of the President as necessary to prevent legislative and Executive powers from becoming blended in the same hands. *Id.,* No. 73, at 442. For more extensive discussion of the constitutionality of legislative vetoes, *see* 37 Op. Att'y Gen. 56 (1933); 41 Op. Att'y Gen. 230 (1955); 41 Op. Att'y Gen. 300 (1957).

alternative governmental review mechanism which would vest the Secretary of State with the power and duty to approve or disapprove amendments to the IACAC rules. This approach would cure the proposed legislation of both constitutional infirmities. IACAC's action in amending the rules would not be an exercise of legislative power because the amendments would not be binding on the government but would be merely advisory. The courts have held similar schemes not to be an unconstitutional delegation of legislative power. *Sun-Shine Anthracite Coal Co.* v. *Atkins,* 310 U.S. 381 (1940); *Todd & Co., Inc.* v. *SEC,* 557 F.2d 1008, 1012–13 (3d Cir. 1977); *R.H. Johnson & Co.* v. *SEC,* 198 F.2d 690, 695 (2d Cir. 1952).

A model for this approach may be found in the Maloney Act, 15 U.S.C. § 78o–3, authorizing Securities and Exchange Commission (SEC) registration of approved associations of securities dealers. Both the Second and Third Circuits have upheld the Maloney Act against a challenge that it unconstitutionally delegates legislative power to private parties. *Todd & Co., Inc.* v. *SEC,* 557 F.2d 1008, and *R.H. Johnson & Co.* v. *SEC,* 198 F.2d 690. Membership in a registered association, as a practical matter, is essential to doing business in over-the-counter securities.[5] The Maloney Act authorizes these associations to adopt substantive as well as procedural rules, to conduct disciplinary proceedings and to enforce sanctions, including expulsion. The associations are required to submit any changes in or additions to their rules to the SEC for review. 15 U.S.C. § 78o–3(j). The rules as amended become effective if within 20 days the SEC has not disapproved the amendments. The SEC is required to disapprove the amendments if they are not consistent with the Act.

The Maloney Act resembles the proposed implementing legislation in that amendments to the rules become effective unless disapproved. A critical difference, however, is that the Act *requires* the SEC to disapprove amendments if they are inconsistent with the Act. The Act, therefore, places an affirmative obligation on the SEC to consider amendments, determine whether they are inconsistent with the Act and disapprove them if they are.

The Secretary of State's review of IACAC's amendments, however, would have to be conducted in accordance with the rule-making requirements of the Administrative Procedure Act, 5 U.S.C. § 553,[6] unless the Secretary's review and adoption of IACAC rules could be considered a foreign affairs function so as to trigger the foreign affairs exemption, 5 U.S.C. § 553(a)(1), or unless an exception were otherwise provided. We understand that your Department interprets that exemp-

---

[5] An association may require its members to charge nonmember brokers the commissions charged to the general public rather than the lower commissions charged to members. 15 U.S.C. § 78o–3(e).

[6] See SEC regulations governing its review of amendments of registered association's rules. 17 C.F.R. 240.19b–4.

tion broadly. Bonfield, *Military and Foreign Affairs Function Rule-Making under the APA,* 71 Mich. L. Rev. 221, 258–62 (1972). We express no opinion on the applicability of this exemption. We would be happy, however, to consider your views on this question and advise you on the exemption's applicability.

If you decide to apply the amended rules only to agreements entered into after the effective date of the amendments, the amendments, because they would be presumed to have been agreed to by the parties to an arbitration agreement, would not have to be approved by the Secretary of State. If you feel that the implementing legislation should, as a matter of policy, provide for some opportunity for governmental review of amendments, you may want to consider a "report and wait" provision. A model for this approach may be found in 28 U.S.C. § 2072 which delays the effective date of procedural rules promulgated by the Supreme Court until 90 days after the rules have been reported to Congress. Within that 90-day period, Congress may through the legislative process revoke all or some of the rules.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*